IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LEONARDO RUIZ and EDWIN AMAYA,<br><br>Defendants. | ORDER<br>and<br>MEMORANDUM DECISION<br><br><br><br>Case No. 2:07-CR-852 TC |

      Defendants Leonardo Ruiz and Edwin Amaya have been charged with possession of a stolen firearm. They have moved to suppress evidence of that crime obtained after an automobile stop conducted by the Sandy City, Utah police. Mr. Amaya, the driver of the car, contends that the initial traffic stop was unlawful. The officer's basis for the stop was that Mr. Amaya's car was listed as uninsured on the officer's in-car computer. Mr. Amaya does not dispute that an officer may generally stop a car for that reason and instead argues that the officer who stopped him did not know enough about the source of the insurance information to make reliance on it reasonable. Mr. Amaya concludes that all evidence against him should be suppressed.[1]

      Mr. Ruiz, the passenger in the car, does not dispute the legality of the initial stop. Instead, Mr. Ruiz asserts that the police illegally detained him beyond the scope of the initial

---

[1] Mr. Amaya also initially argued that his Miranda rights were violated, but has withdrawn that contention.

stop and arrested him without probable cause. Mr. Ruiz concludes that because his detention and arrest were unconstitutional, a confession that he gave after being arrested should be suppressed as the fruit of the poisonous tree. For the reasons set forth below, both Defendants' motions are DENIED.

## FINDINGS OF FACT

On October 25, 2007, Sandy City Patrol Officer Joshua Johnson was on patrol in Sandy City in the area of 9400 South and 1300 East. At around 8:36 a.m., Officer Johnson saw an older white Buick driving west on 9400 South. Although the Buick was not violating any traffic laws, Officer Johnson ran a search on the Buick's license plates. Officer Johnson testified at the hearing on the motions to suppress that it is his practice to randomly check plates in this manner. Officer Johnson testified that he believed that the insurance information the system provided came from the Utah Department of Motor Vehicles ("DMV"), but he was unsure of the source. He further testified that his computer was logged on to the Utah Bureau of Criminal Investigation ("B.C.I.") system when he ran the search.[2]

The results of the plate search indicated that insurance was not found for the Buick. Officer Johnson then pulled the Buick over to determine whether it was insured. Mr. Amaya stopped the car near the entrance of a shopping center. After the stop, Officer Johnson approached Mr. Amaya and requested a driver's license, proof of registration and proof of insurance. Mr. Amaya responded that he had a driver's license but did not have it with him and that he had no registration or insurance in his name because he had bought the car recently. Officer Johnson then asked Mr. Amaya for personal information, which Mr. Amaya provided. Officer Johnson returned to his car to confirm that Mr. Amaya had a driver's license and to find

---

[2] Officer Johnson referred to this entity only as "B.C.I." at the hearing, but the court infers from the context that he meant the Utah Bureau of Criminal Investigation.

out if Mr. Amaya had any outstanding warrants. Officer Johnson found that Mr. Amaya had a valid driver's license and no warrants. Nonetheless, Officer Johnson decided that he should impound the Buick because it was not properly registered or insured.

Officer Johnson called for back-up, which he explained is his normal practice when impounding a vehicle. Officer Johnson explained that he needed another officer at the impoundment to ensure his safety and to assist with the inventory search. Officer Johnson testified that he performs inventory searches pursuant to the Sandy City Police Department's written policy. The government introduced that policy during the hearing. According to Officer Johnson, he did not intend to search the Buick as part of a criminal investigation. It was his understanding that inventory searches are performed to avoid civil liability.

Soon after Officer Johnson made his call for assistance, Officer Heather Jimenez arrived. Officer Jimenez testified that she understood that she was at the stop to help with the impoundment process, not as part of a criminal investigation. Once Officer Jimenez arrived, Officer Johnson returned to the Buick and asked Mr. Amaya to step out of the car. Officer Johnson then told Mr. Amaya that he was not under arrest and asked Mr. Amaya for permission to search him. Mr. Amaya agreed and Officer Johnson patted him down for between 30 and 60 seconds. Officer Johnson did not find any weapons or contraband on Mr. Amaya. After searching Mr. Amaya, Officer Johnson asked Mr. Ruiz to get out of the car. Officer Johnson told Mr. Ruiz that he was not under arrest and asked Mr. Ruiz for permission to search him. Mr. Ruiz consented and Officer Johnson patted him down, also for 30 to 60 seconds. Officer Johnson found no weapons or contraband on Mr. Ruiz. At that time of these pat-down searches, Mr. Amaya and Mr. Ruiz were both on the sidewalk next to the car.

When he had finished searching Mr. Amaya and Mr. Ruiz, Officer Johnson told Mr. Amaya within earshot of Mr. Ruiz that Mr. Amaya had to stay. Officer Johnson explained that

Mr. Amaya need to be there to receive the inventory sheet once the officers had searched the car and to get a card from the towing company. Neither Officer Johnson nor Officer Jimenez told Mr. Ruiz that he was free to go, but both officers testified that they did not tell Mr. Ruiz that he had to stay. Mr. Amaya and Mr. Ruiz remained on the sidewalk next to the Buick when Officer Johnson began his inventory search.

Officer Johnson started his search on the driver's side of the car and found nothing that appeared to be illegal. He then looked in the trunk, where he found a Glock Model .22 caliber handgun, a holster, and ammunition beneath the carpet. Officer Johnson testified that he believed at the time of the search that the holster and bullets were of a type available only to law enforcement, with the bullets only available to federal officers. He stated that Mr. Amaya and Mr. Ruiz looked nervous when he found the gun and he asked them about it. Officer Johnson further stated that Mr. Amaya and Mr. Ruiz both denied that the gun was theirs or that they knew anything about it. Officer Jimenez asked Mr. Amaya if the gun may have been left by the previous owner and Mr. Amaya replied that he had not checked the items left in the car after he bought it.

When he finished with the trunk, Officer Johnson moved to search the Buick's passenger side. Under the passenger seat, out of sight, he found a checkbook. The checkbook was not in the name of either Mr. Amaya or Mr. Ruiz. Officer Johnson suspected that it may have been stolen. Officer Johnson asked Mr. Amaya about the checkbook and testified that Mr. Amaya said that the checks must belong to whoever's name was on them. The officers called the phone number that was on the checks, but the line was disconnected.

Officer Johnson then decided to arrest Mr. Amaya. As Officer Johnson started to handcuff Mr. Amaya, Mr. Amaya resisted. During the scuffle, in which Officer Johnson and Officer Jimenez overpowered Mr. Amaya, Mr. Amaya dropped a key. After subduing and

arresting Mr. Amaya, Officer Jimenez arrested Mr. Ruiz.

The key Mr. Amaya dropped was for the Buick's glove compartment. Once he and Officer Jimenez secured Mr. Amaya, Officer Johnson used the key to open the glove compartment. Inside, he found what he believed was marijuana, along with a pipe.

Mr. Amaya and Mr. Ruiz were then taken to the Sandy City police station for questioning. Both of them gave incriminating statements. Of particular note here is that Mr. Ruiz admitted that he was present when the gun found in the trunk was stolen and that he knew that the gun was in the Buick's trunk while he drove in it. Mr. Amaya and Mr. Ruiz now face on a one-count indictment charging that they violated 18 U.S.C. § 922(j) by possessing a stolen firearm.

## ANALYSIS

**I.     The Initial Stop of Mr. Amaya**

As noted, Mr. Amaya concedes that a police officer is allowed to stop a car if the officer's in-car system indicates that the car does not have insurance. See United States v. Cortez-Galaviz, 495 F.3d 1203, 1205-06 (10th Cir. 2007) and United States v. Thompson, 1:04-CR-148 TC, Order at 11-12 (D. Utah May 12, 2005). But Mr. Amaya notes that in Cortez-Galaviz and Thompson, the government provided the court with detailed descriptions of the source of the insurance information relied on by the officers who had made the stops. See Cortez-Galaviz, 495 F.3d at 1204-05 and Thompson, Order at 3. Mr. Amaya contrasts the specific facts about the source of the insurance data in those cases with the facts provided here. In this case, Officer Johnson stated that he believed, but could not say with certainty, that the insurance report came from the DMV, and that he knew that his computer was logged in to the B.C. I. system. Mr. Amaya concludes that the government did not give enough evidence for the court to find Officer Johnson's reliance on the information reasonable.

The court disagrees. A close reading of Cortez-Galaviz and Thompson do not support the conclusion that an officer must know, and be able to testify to, the exact source of the insurance information for him or her to reasonably rely on that information. In Cortez-Galaviz, the court noted that because the officer knew that "the state database maintained for the purpose of recording vehicle insurance information contained no information suggesting that the owner of the [vehicle] had insured it," the officer had reasonable suspicion to stop that vehicle. 495 F.3d at 1206. Here, Officer Johnson knew that the insurance information on the Buick was provided by the B.C.I. system, which he was accessing through his car's computer. It is not material whether Officer Johnson was aware of which precise entity was responsible for giving the B.C.I. that data. Rather, it is enough that Officer Johnson knew that the state maintained insurance records, and that he could access those records through the B.C.I. system. Accordingly, the court finds that Officer Johnson's initial stop was based on reasonable suspicion.

## II.      The Detention and Arrest of Mr. Ruiz

Mr. Ruiz does not dispute that the initial stop was valid. Mr. Ruiz also does not suggest Officer Johnson was not permitted to ask Mr. Ruiz to step out of the Buick. See, e.g., United States v. Ladeaux, 454 F.3d 1107, 1110 (10th Cir. 2006) (acknowledging "bright-line rule that, during a lawful traffic stop, officers may order passengers out of the car as a matter of officer safety"). Further, Mr. Ruiz does not assert that his consent to the initial pat-down search of him was not voluntarily given.

Instead, Mr. Ruiz argues that the permitted scope of the traffic stop reached no further than determining that Mr. Amaya did not have insurance and starting the impound. According to Mr. Ruiz, Officer Johnson and Officer Jimenez continued to hold him at the stop after taking these actions without any legal cause to do so, amounting to an illegal detention. Mr. Ruiz further maintains that he was arrested without probable cause. Mr. Ruiz concludes that his

confession, which occurred after an unbroken chain of events following his detention, is poisonous fruit and should be suppressed.

The government appears to concede that there was no lawful reason for the officers to detain Mr. Ruiz after he got out of the Buick and was searched. Rather, the government contends that Mr. Ruiz was not detained after he was searched. To the contrary, the government argues, Mr. Ruiz voluntarily stayed during the inventory search. During the inventory search, the government maintains, the officers formed probable cause to arrest Mr. Ruiz. The government concludes that because Mr. Ruiz willingly stayed at the traffic stop and was lawfully arrested, his confession should be admitted.

The parties therefore ask the court to answer two questions. First, was Mr. Ruiz detained during the inventory search, or was his presence there consensual? Second, did the officers have probable cause to arrest Mr. Ruiz?

The first question is important because no reasonable suspicion is needed to support a consensual encounter. See United States v. Chavira, 467 F.3d 1286, 1290 (10th. Cir. 2006). The test to determine if an encounter with police is consensual is whether "a reasonable person under the circumstances would believe he was free to leave." United States v. McKneely, 6 F.3d 1447, 1451 (10th Cir. 1993). Mr. Ruiz asserts that several actions taken by the officers would make a reasonable person in Mr. Ruiz' situation feel compelled to stay. First, Officer Johnson told Mr. Amaya to stay, which Mr. Ruiz heard. But neither of the officers specifically told Mr. Ruiz he could go. Second, there were two officers at the traffic stop. Finally, while Mr. Ruiz does not deny that he consented to being patted down, he maintains that the search was a physical show of force.[3]

---

[3]Mr. Ruiz also contends in his brief that Officer Johnson instructed him where to stand during the search of the Buick. This fact, if clearly established, would be compelling. But a careful review of the hearing transcript does not convince the court that either officer told Mr.

The government denies that these actions amounted to a detention and the court agrees. Mr. Ruiz is correct that a search (even though consensual), the presence of two officers, and hearing a companion be instructed to stay would be indications to a reasonable person that he or she would have to stay . See, e.g., Chavira, 467 F.3d at 1290-91 (a reasonable person may feel compelled to stay by "the presence of more than one officer" and "the physical touching the detainee").

But in deciding whether police made "a coercive show of authority," courts look at the "totality of the circumstances," not isolated facts. See id. at 1291. Here, the overall circumstances don't show that the officers took actions that would have made a reasonable person in Mr. Ruiz' position feel compelled to stay. First, the stop occurred during the daytime on the shoulder of a public road outside of a shopping center. See, e.g., United States v. Soto, 988 F.2d 1548, 1558 (10th Cir. 1993) (fact that a stop happens in public view weighs against finding of overt coercion.) Further, there was no indication on the record that the officers took their guns out of their holsters, used aggressive tones of voice, or touched Mr. Ruiz beyond the brief consensual pat-down. See id.

Moreover, while Mr. Ruiz heard Officer Johnson tell Mr. Amaya to stay, Officer Johnson made it clear that Mr. Amaya only needed to be there to receive the record of the inventory search and the towing company's card. A reasonable passenger (at least one who did not own the car or anything valuable in it) would not assume that he or she would have to stay for that. And while the officers did not tell Mr. Ruiz he could leave, this alone does not establish compulsion. See Chavira, 467 F.3d at 1291. What's more, Officer Johnson did tell Mr. Ruiz

---

Ruiz where to stand during the search. The passages Mr. Ruiz cites in favor of this proposition more strongly suggest that Officer Johnson directed Mr. Ruiz to the sidewalk for the pat-down search and that neither officer said that Mr. Ruiz had to stay there during the search of the car after that.

that he was not under arrest.

Further, the presence of two officers at the stop does not conclusively establish a coercive show of force. See id. The record reflects that Officer Jimenez did not take any overt acts toward Mr. Ruiz that would have made him feel compelled to stay at the beginning of the search.

Overall, Officer Johnson and Officer Jimenez gave convincing testimony that they initially treated the stop as a civil impoundment, not a criminal investigation. The court is persuaded that the officers' demeanor toward Mr. Ruiz at the beginning of the encounter was consistent with that understanding. Given the totality of the circumstances, the court concludes that the officers did not make a coercive show of authority against Mr. Ruiz. Consequently, the court finds that Mr. Ruiz did not have an objectively reasonable belief that he had to stay after he was patted down, leading to the conclusion that his presence at the traffic stop after that point was consensual.

The court further finds that during Mr. Ruiz' consensual presence at the traffic stop, the presence of possibly stolen checks under Mr. Ruiz' seat gave the officers probable cause to arrest Mr. Ruiz. "Probable cause for an arrest exists if, under the totality of the circumstances, a 'reasonable person [would] believe that an offense has been or is being committed by the person arrested.'" United States v. Burgess, 33 Fed. Appx. 386, 388 (10th Cir. 2002) (citation omitted). Here, the officers found a checkbook that did not match Mr. Ruiz' or Mr. Amaya's name under Mr. Ruiz' seat. Officer Johnson suspected that it was stolen. Shortly before finding the checkbook, the officers found a gun along with what appeared to be law enforcement-type holster and bullets. Officer Johnson testified that Mr. Ruiz looked nervous when he was shown and asked about the gun. Shortly after, Mr. Amaya resisted arrest and the officers found marijuana. While Mr. Ruiz likens himself to a bystander at the scene of a crime, the totality of the circumstances gave the officers probable cause to arrest Mr. Ruiz.

In conclusion, the court finds that Mr. Ruiz voluntarily chose to remain at the traffic stop and that his arrest was supported by probable cause. Accordingly, Mr. Ruiz' confession is not the fruit of the poisonous tree and will not be suppressed.

## **ORDER**

For the above reasons, Mr. Amaya's and Mr. Ruiz' motions to suppress (Dkt. Nos. 33, 35 & 36) are DENIED.

DATED this 29th day of August, 2008.

BY THE COURT:

*[signature: Tena Campbell]*

TENA CAMPBELL
Chief District Judge